IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KENAN NEAL,<br><br>　　　　　Petitioner,<br><br>vs.<br><br>WARDEN LYNEAL WAINWRIGHT,<br><br>　　　　　Respondent. | CASE NO. 1:21-cv-976<br><br>DISTRICT JUDGE<br>CHARLES ESQUE FLEMING<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT &<br>RECOMMENDATION** |

Petitioner Kenan Neal filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. Doc. 1. Neal is in custody at the Marion Correctional Institution due to a journal entry of sentence in the case *State v. Neal*, Crawford County Court of Common Pleas, Case Nos. 14-CR-0626 and 15-CR-0062. The Court referred this matter to a Magistrate Judge under Local Rule 72.2 for the preparation of a Report and Recommendation. For the following reasons, I recommend that the Petition be dismissed as time-barred.

**Summary of facts**

In habeas corpus proceedings brought by a person under 28 U.S.C. § 2254, factual determinations made by state courts are presumed correct. 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. *Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012).

The Ohio Court of Appeals for the Third Appellate District summarized the facts underlying Neal's conviction for drug-related crimes as follows:

> {¶4} Officer Jeremy Mohn of the Ontario Police Department was the first witness to testify. He stated that between March 2010 and April 2013, he was an officer with the Crestline Police Department ("the Department"), and in April 2013, he was promoted to detective. He added that on November 10, 2014, he was the Department's active detective.

> {¶5} Officer Mohn testified that he began investigating Neal in 2011 after the Department received complaints of drug-related activity occurring at Neal's home. He stated that while surveilling Neal's home, he noticed signs indicative of drug-related activity, particularly with regard to the traffic patterns of Neal's visitors. Despite these signs, Officer Mohn testified that he was never able to get enough evidence to obtain a search warrant.

> {¶6} Officer Mohn testified that in the fall of 2014, Neal moved to another home in Crestline and between August 2014 and November 2014, there were "numerous incidents of traffic coming to the back of the residence, through the alleyway, stopping and being there for a few minutes, going to the backdoor, and then leaving again." Trial Tr., p. 120.

> {¶7} Office Mohn testified that on the evening of November 10, 2014, he learned that Neal's residence had been burglarized and one of the suspects, later identified as Toi Pickens, had been apprehended. He learned that Pickens invaded Neal's residence in order to "rob [Neal] of drugs and money that was supposedly in [Neal's] house." *Id.* at p. 124. He further learned that Pickens was caught with a stolen firearm that Pickens claimed to have taken directly from Neal. He learned that the stolen firearm was one of multiple firearms stolen during a home invasion in Bucyrus and that Pickens claimed to have observed an additional firearm in Neal's

2

home. Officer Mohn stated that with this information, he was able to obtain a warrant to search Neal's residence.

{¶8} Office Mohn testified that Neal and his wife were present at Neal's residence when the warrant was served and executed. He stated that they appeared shocked at first and "then it turned into an agitated 'F this, F that, I don't need you.'" *Id*. at p. 129. He added that Neal was eventually removed from the premises because of safety concerns.

{¶9} Officer Mohn testified that the main living area and an upstairs bedroom were the first rooms searched. Officer Mohn testified that as he was speaking with Neal, Officer Eshelman informed him that a closet door in the upstairs bedroom was locked. He stated that Officer Eshelman inquired about a key but was told there was none. He added that once the fire department was called, "[Neal's wife] advised that there were keys and give us the key that way no damage had to be done to the residence." *Id*. at p. 132. He stated that Neal gave him a keyring, which was located on a table in the front dining room. He added, "[Neal] was asked if there was anybody else [sic] or any other keys, he advised, no, there were no other keys, he was the only one to hold the key and he was the only one to have access to that room." *Id*. at p. 132.

{¶10} Officer Mohn testified that inside the closet was a safe. He stated that another key on the keyring opened the safe and inside the safe were two bags: one bag contained $9,700 in cash and the other bag contained a large white rock substance, later identified as 37.75 grams of cocaine.

{¶11} Officer Mohn testified that inside that bedroom's dresser drawer was a nine-millimeter, semi-automatic firearm and ammunition. He explained that the firearm's serial number was run through LEADS, and the report confirmed that the firearm, along with two others, had been stolen during a home invasion in Bucyrus. He added that

3

the drawer also contained several tablets, later identified as oxycodone and methadone; a plate, with reside on it; and a straw.

{¶12} Officer Mohn stated that the bedroom also contained a laptop and a television hooked up to two surveillance cameras capturing an adjacent alleyway and the home's back door. Officer Mohn stated that inside a cabinet next to the back door, they found a large, white rock, later identified as 23.19 grams of cocaine; sandwich bags; scales; a razor blade; and a plate. He added that these tools are often used to cut and distribute drugs.

{¶13} Officer Mohn testified that while the search was underway, he spoke to Neal and his wife. He explained, "[Neal] had approached me basically and in reference to doing things to assist [the Department] at that point in time in reference to other potential drug traffickers or people in possession of drugs at that point." *Id*. at p. 165. Office Mohn stated that Neal "did not directly express why he wanted to give that information, other than he wanted to provide information at that point in time so that that [sic] way [sic] maybe help out his case." *Id*. Officer Mohn stated that he told Neal they would discuss things back at the Department.

{¶14} Officer Mohn testified that before taking Neal to the Department, Neal "again approach[ed] me in reference to talking to officers, myself in particular, in reference to helping out [sic] providing information on his behalf." *Id*. at p. 169. Officer Mohn added that in his experience, people offer information in order to receive a lesser sentence. He added that Neal also requested to see his daughter before he left, which he allowed.

{¶15} Officer Mohn testified that back at the Department, Neal waived his *Miranda* rights and spoke with him for approximately one hour. He explained that during their conversation, Neal provided information on numerous drug dealers and

traffickers and stated that his home was broken into because people were trying to "take over portions of his territory" in order to be a "bigger organization." *Id*. at p. 174. He stated that Neal also admitted to purchasing the firearm found on Pickens and the firearm found in the upstairs bedroom from a female who lived at the Galion Arms Apartments and recalled the female selling a third firearm to an individual from Mansfield. He added that Neal also admitted that he took Percocet.

{¶16} Officer Scott Eshelman of the Crestview Police Department was the second witness to testify. Officer Eshelman testified that he responded to a 9–1–1 call at Neal's residence on the evening of November 8, 2014. He explained that when he arrived at the residence, Neal stated that two, armed, black males had broken into his home, tied up his wife, and took him to the upstairs bedroom to look for something. A fight ensued, however, and the men fled.

{¶17} Officer Eshelman testified that Pickens was later apprehended and stated he had been recruited to break into Neal's house to rob him of "$20,000 in cash and possibly some heroin and crack cocaine." *Id*. at p. 196. He explained that a firearm was found on Pickens, and Pickens claimed to have taken the firearm from Neal. Officer Eshelman testified that the firearm was run through LEADS and "came back out of a burglary out of Bucyrus a short time before this incident, it came back stolen essentially." *Id*. at p. 197. He stated that he informed Officer Mohn of these events, and a warrant was obtained to search Neal's residence.

{¶18} Officer Eshelman testified that executing the search warrant was a unique situation because they believed there were children in the residence. He explained that he told Neal and his wife that "[he] was there to do a follow-up investigation in reference to the burglary." *Id*. at p. 200. He stated that "[he] thought it would be safer to approach that that [sic] way since there was [sic] children in the house, that

5

way there wasn't a, you know, a technical assault on the * * * house." *Id*. Officer Eshelman testified that after serving the search warrant and securing the area, Neal asked to talk to Officer Mohn, and the two went outside.

{¶19} Officer Eshelman stated that during his search of the upstairs bedroom, he encountered a locked closet door. He stated that when he asked Neal for the key, Neal "got upset, repeatedly stat[ed] no, he was pacing back and forth." *Id*. at p. 202. Officer Eshelman stated that eventually Neal's wife asked Neal to "just give [them] the key so [they] d[o not] tear up the house." *Id*. at p. 202–203. He stated that Neal was "reluctant" but ended up giving them a keyring. *Id*. at p. 203. Officer Eshelman added that he did not hear Neal being asked any questions about the key.

{¶20} Officer Eshelman testified that inside the closet door was a safe. He stated that he opened the safe with another key on the keyring and inside the safe were two bags: one bag contained $9,700 and a title to a vehicle, and the other bag contained a large white rock. He testified that he also found a firearm; some prescription pills; a plate with some powder residue on it; and a straw in a dresser drawer. He stated that the dispatch center ran a check on the firearm's serial number and "it came back again stolen." *Id*. at p. 207. Specifically, he stated that the firearm's serial number matched the serial number of a firearm stolen during a burglary in Bucyrus.

{¶21} Officer Eshelman stated that there was also a television hooked up to a security system. He explained that the system consisted of two cameras, one capturing the back alley and one capturing the laundry room's backdoor. He stated that he collected the cameras and searched the laundry room. He stated that in the laundry room, near a microwave and a large cabinet, he found "another plate with residue on it, electronic scales with residue, and * * * another large rock and some smaller rocks suspected to be cocaine." *Id*. at p. 210–211.

6

{¶22} Officer Eshelman testified that he and Officer Mohn spoke with Neal at the Department. He stated that they spoke to Neal in order to "try[ ] to get further information on other drug activity in the city." *Id*. at p. 212. He stated that Neal waived his *Miranda* rights and made a voluntary statement. Officer Eshelman testified that Neal stated he believed he was set up by former partners who wanted to grow their drug operation as big as his. He stated that Neal admitted to "mainly run[ning] in * * * rock and crack cocaine." *Id*. at p. 215. Officer Eshelman stated that he did not ask Neal if the drugs found in his house were his because

> he had the keys to—we found the crack cocaine essentially behind two locked doors that he possessed * * * the keys for. It was in his room where he says he stays. The layout of the upstairs, it was clear that—I'm not sure if it's considered a two or three bedroom, because the other two bedrooms are kinda odd shaped, but there is [sic] three beds. There's three beds upstairs, there's [Neal's] room, which is clear, there's the bed, the t.v., and other items. The other two beds contained a mixture of adult female items and child items.

*Id*. at p. 215–216. He added that Neal admitted to buying pills from someone in Crestline.

{¶23} Officer Eshelman testified that Neal also admitted that he had purchased two firearms from "Mama." He stated that Neal identified where "Mama" lived and the type of car she drove. He added that Neal also recalled "Mama" selling a third firearm to an individual from Mansfield and identified the individual's first name and vehicle description.

7

{¶24} Erica Foster was the last witness to testify in the State's case-in-chief. She testified that in December 2014 she worked as an intake caseworker with the Crawford County Children Services. She stated that as a caseworker, it was her job to investigate cases of child abuse and neglect. She stated that she received a complaint from the Crestline Police Department "that there was drug use potentially in the home as well as substances found in the home." *Id.* at p. 230.

{¶25} Foster stated that on December 23, 2014, she went to the Crawford County Jail to interview Neal. She explained, "I have a mandate by the State that I have to complete interviews with all parties involved, so anytime someone is an alleged for [sic] perpetrator in a case, if possible at all, we have to complete an interview with that person." *Id.* at p. 222–223. She added that she was not working on behalf of any police agency. She testified that she did not recall whether she asked Neal what he was charged with; she explained, "I was more trying to determine what was in the home that the child could have been exposed to." *Id.* at p. 230–231.

{¶26} Foster testified that during her conversation with Neal, Neal admitted that there was cocaine and Percocet in his residence and that he used it for his own personal use. He added that "it was not [for his wife's] use at all." *Id.* at p. 224. Foster testified that when she asked Neal where the cocaine and Percocet were stored, he stated that it was locked away upstairs in a back room. She added that Neal never indicated that anyone else used the cocaine or that the cocaine had been planted. Upon conclusion of Foster's testimony, the State rested.

{¶27} Neal testified as the defense's sole witness. He testified that on November 8, 2014, two armed men entered his home, pistol whipped him, and tied up his wife. He stated that he did not know or recognize the men and never found out who they were. He testified that at that time he was not employed because he was going through a workers

8

compensation claim. He added that he recently received a $10,000 settlement, which he put in his safe because he and his wife were planning a vacation.

{¶28} Neal testified that when Officer Eshelman arrived at his home on November 10, 2014, Officer Eshelman "had me believing that he came there for the follow-up on a home invasion." *Id*. at p. 251. He stated that when his wife opened the door, Officer Eshelman informed him that he had a search warrant related to drug trafficking. Neal testified that he told Officer Eshelman, "what do you mean, I never saw drugs in my life?" *Id*.

{¶29} Neal testified that while the officers were searching his home, Officer Mohn called him outside and said "If you scratch my back, I'll scratch your back." *Id*. at p. 255. He testified that Officer Mohn asked him if he knew of any drug activity, and he told Officer Mohn about several individuals who he heard sold drugs.

{¶30} Neal testified that the upstairs bedroom was a spare bedroom, where he kept some of his personal belongings, including his clothing, safe, and surveillance equipment. He stated that when the officers asked him for a key to his safe, he told them it was on the bed. He explained that he "ha[d] no knowledge of the cocaine being there * * * before the officer made it into the house." *Id*. at p. 253. He added that he did not recall the Percocet, methadone, or firearm being in the home. Neal further testified that he did not recall making any statements to Officer Mohn and Officer Eshelman at the Department.

{¶31} Neal testified that when he spoke with Foster, she "accused [him] of selling drugs, moving drugs out of the house, [sic] neglecting [his] child." *Id*. at p. 254. He stated that she told him that the Department had found drugs in his safe. Neal stated that when he told Foster he did not know what she was talking about, she replied, "Well, I'm paying for

the police [sic] face value and I'm going with that."
*Id.* at p. 255. At the conclusion of Neal's testimony, the defense rested.

{¶32} Thereafter, the State re-called Officer Mohn, and he authenticated the audio recording of Neal's interview at the Department. The interview was played for the jury and admitted into evidence.

*State v. Neal*, Nos. 3–15–13, 3–15–14, 2016 WL 3144385, at *1–6 (Ohio Ct. App. June 16, 2016).

### Procedural background

*Trial court proceedings*

In December 2014, a Crawford County Grand Jury indicted Neal on one count of drug possession. Doc. 6-1, at 1 (Exhibit 1).[1] The court appointed Neal counsel and the case was assigned number 14-CR-0262. *Id.* at 2 (Exhibit 2).

Neal filed a motion to suppress all of the evidence obtained during the search and seizure at Neal's residence, arguing that there was no probable cause to support the search warrant. Doc. 6-1, at 3–18 (Exhibit 4). The State filed a response. *Id.* at 19–32. The trial court held a hearing, Doc. 6-2, at 2–67 (Transcript, Tr. Vol. 1), and overruled Neal's motion to suppress, Doc. 6-1, 33–34 (Exhibit 5).

In March 2015, a Crawford County Grand Jury indicted Neal on one count of receiving stolen property and three counts of drug possession. Doc. 6-

---

[1]     In this report and recommendation, all of the citations to the docket refer to the ECF document and page number shown at the top of the page.

1, at 35–36 (Exhibit 6). The court appointed Neal counsel and the case was assigned number 15-CR-0062. *Id*. at 37 (Exhibit 7).

The State filed a motion to consolidate the two cases, Doc. 6-1, at 38 (Exhibit 8), which the trial court granted, *id*. at 39 (Exhibit 9). The court ordered that all pleadings were to be filed in the earlier case, number 14-CR-0262. *Id*.

The case proceeded to trial. The jury found Neal guilty as charged. Doc. 6-1, at 41 (Exhibit 10). Specifically, Neal was found guilty of possessing methadone, two different kinds of oxycodone pills, and cocaine. *Id*. at 42–44, 46. At sentencing, the trial court sentenced Neal to an aggregate prison term of ten years, as follows: eight years in prison for possessing cocaine, twelve months in prison for receiving stolen property, six months in prison for possessing methadone, and six months in prison for each count of possessing oxycodone. *Id*. at 49 (Exhibit 11). The court ordered the two oxycodone sentences to run concurrent with each other and consecutive to the other sentences. *Id*.

*Direct appeal*

On August 18, 2015, Neal, through new counsel, timely filed in the Ohio court of appeals two notices of appeal—one for each case number, Doc. 6-1, at 51 (case no. 14-CR-0262 (Exhibit 12)), 53 (case No. 15-CR-0062 (Exhibit 13))— and a motion to consolidate the appeals, *id*. at 62 (Exhibit 14). The Ohio court of appeals granted Neal's motion to consolidate and ordered all future filings

11

to be submitted in the first-filed appeal, case number 3-15-13. *Id.* at 64 (Exhibit 15). In his brief, Neal raised the following assignments of error:[2]

> 1. The trial court jury verdict that Appellant was guilty of possession of drugs and receiving stolen property was against the manifest weight of the evidence.

> 2. The evidence against the Appellant was legally insufficient to support the jury's guilty verdict.

Doc. 6-1, at 66 (Exhibit 16). On June 6, 2016, the Ohio court of appeals affirmed the trial court's judgment. *Id.* at 119–38 (Exhibit 18).

On August 24, 2016, Neal pro se filed in the Ohio Supreme Court an untimely notice of appeal, Doc. 6-1, at 140 (Exhibit 19), and motion for leave to file a delayed appeal, *id.* at 142 (Exhibit 20). The Ohio Supreme Court granted Neal leave to file a delayed appeal. *Id.* at 167 (Exhibit 21). In his memorandum in support of jurisdiction, Neal raised the following propositions of law:

> 1. The trial court erred in overruling a pretrial suppression hearing motion. The search warrant affidavit failed to particularly name and describe the property searched for and seized.

> 2. The trial court allowed the State to withhold evidence. The primary witness and accuser did not testify at trial. The jury could not examining the accuser.

> 3. The trial court erred in overruling a pretrial suppression hearing. The search warrant failed to

---

[2]    Except where noted, Neal's claims are reproduced as written.

show the judge's signature, and the jurisdiction of
the court.

Doc. 6-1, at 176–77 (Exhibit 22). On April 19, 2017, the Ohio Supreme Court

declined under its rule of practice 7.08(B)(4) to accept jurisdiction of Neal's

appeal. *Id*. at 215 (Exhibit 24).

*Motion for judgment of acquittal*

Meanwhile, on June 1, 2016, Neal filed in the trial court a motion for

judgment of acquittal. Doc. 6-1, at 236 (Exhibit 30). In his motion, Neal

challenged the testimony of the State's witness, Toi Pickens. *Id*. The trial court

denied Neal's motion on July 25, 2016. *Id*. at 241 (Exhibit 32). Neal did not

appeal the trial court's decision.

*Motion for new trial*

On January 11, 2017, Neal filed in the trial court under Ohio Criminal

Rule 33 a motion for new trial. Doc. 6-1, at 242 (Exhibit 33). On February 3,

the trial court held the motion in abeyance until the Ohio Supreme Court ruled

on Neal's then-pending appeal. *Id*. at 244. (Exhibit 34). In September, Neal

filed a motion for an evidentiary hearing. *Id*. at 245 (Exhibit 35). On January

22, 2018, the trial court denied Neal's motion for new trial, finding that it was

untimely and barred by res judicata. Doc. 6-1, at 247–48 (Exhibit 36).

On February 1, 2018, Neal filed two notices of appeal in the Ohio court

of appeals, each of them appealing the trial court's denial of his motion for new

trial. Doc. 6-1, at 249–52 (Exhibit 37); 329–32 (Exhibit 43). The Ohio court of

appeals consolidated Neal's appeals on February 22, 2018. *Id*. at 254. Neal filed

13

a motion to voluntarily dismiss his appeals, without prejudice, *id*. at 322, but the Ohio court of appeals denied Neal's motion because no Ohio appellate rule permitted an appellant to dismiss without prejudice an appeal. *Id*. at 333 (Exhibit 44). Neal filed an appellant brief, in which he raised the following assignments of error:

> 1. The trial court erred in overruling a pretrial motion to suppress evidence.
>
> 2. The trial court erred in admitting evidence obtained during the execution of a unsigned search warrant.
>
> 3. The state withheld evidence material to the guilt and favorable to the defendant.

Doc. 6-1, at 255, 258 (Exhibit 38). On June 20, 2018, the Ohio court of appeals affirmed the trial court's judgment. *Id*. at 324 (Exhibit 42). It agreed with the trial court that Neal's claims were barred by res judicata because they could have been raised on direct appeal. *Id*. at 327.

Neal did not appeal.

*First delayed application to reopen under Ohio Appellate Rule 26(B)*

On December 31, 2018, Neal filed in the Ohio court of appeals under Ohio Appellate Rule 26(B) a delayed application to reopen his direct appeal due to ineffective assistance of appellate counsel. Doc. 6-1, at 216 (Exhibit 25). Neal cited "new evidence" he had just discovered and asked for leave to raise a claim that his appellate counsel was ineffective for failing to raise this claim on direct appeal:

> The testimony of child advocate Erica Foster. Foster stated that on December 23, 2014 she went to the Crawford county jail to interview (Neal) the defendant. Foster explained "I have a mandate by the state that, I have to complete interviews with all parties involved." R.C. 2151.421.

Doc. 6-1, at 216. Neal argued that Foster's interview at the prison was improper and violated Neal's "self-incrimination rights." *Id*. at 218. He also filed an affidavit. *Id*. at 226 (Exhibit 26). On January 11, 2019, the Ohio court of appeals denied Neal's application as untimely and explained that Neal had not shown good cause for filing his application more than two years late.[3] *Id*. at 227–28 (Exhibit 27).

Neal did not appeal the Ohio court of appeals' decision.

*Post-conviction petition*

On September 19, 2019, Neal filed in the trial court a post-conviction petition. Doc. 6-1, at 339 (Exhibit 46). He raised the following grounds for relief:

> 1. The state knowing used coerced statement made by the defendant to obtain a guilty verdict.
>
> 2. The state witness Toi Pickens was not a credible witness, and the affidavit for search warrant does not state that (Pickens) was reliability or if he had be used in the past.
>
> 3. The state witness Erica Foster was not credible. And was used as an agent of law enforcement, and

---

[3]     An Ohio Appellate Rule 26(B) application to reopen is due "within ninety days from journalization of the appellate judgment unless the applicant shows good cause for filing at a later time." Ohio App. R. 26(B)(1).

she did not use a Miranda waiver prior to the interview.

Doc. 6-1, at 339. On September 24, 2019, the trial court rejected Neal's petition as untimely and barred by res judicata. *Id*. at 342–43 (Exhibit 47).

About a year later, on September 28, 2020, Neal filed a motion for leave to file an untimely appeal of the trial court's decision. Doc. 6-1, at 344 (Exhibit 48). On October 5, 2020, the Ohio court of appeals denied Neal's motion for leave because it wasn't properly filed. *Id*. at 345 (Exhibit 49). Neal did not appeal this decision.

*Motion for leave to file a motion for new trial*

On February 5, 2020, Neal filed in the trial court a motion for leave to file a motion for new trial. Doc. 6-1, at 347 (Exhibit 50). He cited ineffective assistance of trial counsel for counsel's alleged failure to review "interrogation tapes prior to trial." *Id*. Neal then filed a motion to amend his motion, asking for leave to file a "judgement of acquittal." *Id*. at 348. (Exhibit 51). On August 26, 2020, the trial court interpreted Neal's motions as a request under Ohio Revised Code 2953.21 for post-conviction relief and denied the motions as untimely and barred by res judicata. *Id*. at 349–50 (Exhibit 52). Neal did not appeal.

16

*State habeas petition*

On October 8, 2020, Neal filed in the Ohio Supreme Court a petition for

a writ of habeas corpus. Doc. 6-1, at 351. He raised the following claims:

> 1. The violation of the Fourth Amendment to the
> United States Constitution. Ohio Constitution
> Section 14, Art. I. The violation of Authority to issue
> a valid search warrant.
>
> 2. The violation of the Fourth Amendment to the
> United States Constitution. Ohio Constitution
> Section 14, Art. I. The violation of Authority to issue
> a valid affidavit for search warrant.

*Id*. at 352 (Exhibit 53). On November 24, 2020, the Ohio Supreme Court

dismissed Neal's petition. *Id*. at 371 (Exhibit 54).

*Second delayed application to reopen under Ohio Appellate Rule 26(B)*

On January 12, 2021, Neal filed in the Ohio court of appeals under Ohio

Appellate Rule 26(B) a second delayed application to reopen his direct appeal.

Doc. 6-1, at 229 (Exhibit 28). Neal argued that trial and appellate counsel were

ineffective for failing to investigate, object, and raise the following issues

summarized as follows:

> 1. Motion to suppress evidence, no probable cause for
> the search warrant.
>
> 2. Coerced confession.
>
> 3. Foster's testimony was improper because Neal
> unknowingly incriminated himself during Foster's
> interview.
>
> 4. Neal wore ankle shackles at trial.

5. The prosecution failed to disclose State witness Toi Pickens

6. The prosecution failed to disclose all evidence, including a police report.

7. Neal was deprived a right to compulsory process and fair jury selection.

8. Ineligible jurors.

9. Neal was denied a fair hearing about the reliability and voluntariness of his confession.

10. Confrontation Clause violation when primary witnesses did not appear for cross-examination.

11. Ineffective assistance of trial counsel for failing to object and investigate the case before trial.

12. Appellate counsel raised weak claims on appeal.

Doc. 6-1, at 230–33. On March 8, 2021, the Ohio court of appeals denied Neal's

delayed application as untimely. *Id*. at 234–35 (Exhibit 29). Neal did not appeal

the Ohio court of appeals' decision.

*Federal habeas corpus petition*

On May 3, 2021, Neal filed a federal habeas corpus petition under 28

U.S.C. § 2254.[4] Doc. 1. He raised the following grounds for relief:

**Ground one**: Right to confrontation clause of U.S. Cons. Tori Pickens—State Witness

*Supporting facts*: The prosecution withheld audio tape (DVD) of Tori Pickens a key state witness. His statements was held on the same audio

---

[4]     A petition is deemed filed when a petitioner places it the prison mailing system. *Houston v. Lack*, 487 U.S. 266, 270 (1988). Neal states that he placed his Petition in the prison mailing system on May 3, 2021. Doc. 1, at 30.

tape (DVD) as the Neal audio taped confession. If the jury would have heard his testimony it would have changed the outcome of the jury verdict. Pickens lies on the audio tape, gives false testimony. State did not prove its case beyond a reasonable doubt. Toi Pickens was available for trial and was not called by the state to testify. State violated right to confront clause.

**Ground two**: Search warrant affidavit

*Supporting facts*: 1. Particularity requirement, no description of the items must supply information to guide police. 2. Affidavit must be supported by facts related to the time of the issue, to justify a finding of probable cause. 3. Nexus between drug activity and search of residences. Det. Mohn investigation was for 322 W. Bucyrus St address. A 3 week investigation was held for the place searched 207 N. Henry St. Det. Mohn does not give any statement in affidavit of drug activity at the 207 N. Henry St. residence. The good faith exception to the exclusionary rule should not apply in this case. I'm asking for a de novo review of motion to suppress evidence hearing, which was held by the State but overruled.

**Ground three**: Withhold testimony of state witness—Katherine Gear—confrontation clause

*Supporting facts*: The prosecution used/withheld at trial the testimony/and police report made by Gear. Eyewitness was present during execution of the warrant and home invasion. Neither police report or testimony was heard by jury at the trial. Right to confront witness at trial.

**Ground four**: Introduction of tape audio confession defendant statements—right to counsel

*Supporting facts*: I requested counsel prior to the interview. The confession violates Miranda waiver statutes. It was introduced at trial to self-incriminate me. I was to give the statement, so I

could return home and wait for counsel for second interview. I was forced to give a statement against my will. If the habeas court review the audio tape you can hear the det. Mohn force me to give testimony mark 00:01—00:10+ of the audio tape. The officer says—if you help me, I will help you.— Actual words—you scratch my back, I'll scratch yours.

**Ground five**: Sufficiency of evidence

*Supporting facts*: AEDPA does not govern a sufficiency of the evidence claim under the Winship doctrine. The constitution prohibits the criminal conviction of one person except upon proof of guilt beyond a reasonable doubt.

**Ground six**: Admission of statements by Crawford County caseworker Erica Foster, prosecutorial misconduct, effective assistance of counsel.

*Supporting facts*: The child advocate is required by Ohio law only to conduct an investigation in cooperation with law enforcement…. Erica Foster came to visit me in jail 3 times. First, time it was a day later. She asked me some questions then cancelled the interview. The second was at the court house where she again cancelled the interview because of a bad search warrant.

**Ground seven**: Petitioner was visibly and unconstitutionally shackled at the waist and ankles during trial with no on the record justification for the shackling.

Doc. 1, at 3, 8, 10, 17–18, 22, 25. The Warden filed a Return of Writ, Doc. 6,

Neal filed a Traverse, Doc. 7, and the Warden filed a Reply, Doc. 8.

**Law and Analysis**

*1.    Neal's Petition is time-barred*

The Warden argues that Neal's Petition is time-barred. Doc. 6, at 19–27; Doc. 8, at 1–2. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214, provides a one-year limitations period in a habeas action brought by a person in custody from a state court judgment.  Under 28 U.S.C. § 2244(d)(1), the limitation period runs from the latest of—

> (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

The Warden asserts that section 2244(d)(1)(A) is the only section that applies to Neal's case. Doc. 6, at 20. Neal does not dispute the Warden's

assertion, and review of Neal's filings does not indicate that any section other than 2244(d)(1)(A) would apply.[5]

Neal's conviction became final on July 17, 2017. This is so because the Ohio Supreme Court declined to accept jurisdiction of Neal's direct-review appeal on April 19, 2017. Doc. 6-1, at 215. Neal had 90 days to file a petition for certiorari in the United States Supreme Court, *see* Sup. Ct. R. 13, but Neal did not file a petition and the 90-day period expired on July 17, 2017. The limitations period began running the next day, *see Bronaugh v. Ohio*, 235 F.3d 280, 285 (6th Cir. 2000) (the statute of limitations begins running the day after the event or default), and expired one year later, on July 18, 2018. Neal filed his habeas petition on May 3, 2021, almost three years late.

Neal's January 2017 motion for a new trial, which was ultimately rejected by the Ohio court of appeals in June 2018, does not delay the start of the limitations period. "The distinction between direct and collateral review is significant in the application of the AEDPA time limit. Direct review delays the start of the statute of limitations. Collateral review merely tolls its running." *Lambert v. Warden, Ross Corr.*, 81 F. App'x 1, 3 (6th Cir. 2003); *see Lopez v. Wilson*, 426 F.3d 339, 346 (6th Cir. 2005). In *Pudelski v. Wilson*, 576

---

[5]     To the extent that a portion of Neal's petition could be construed as an assertion that Neal has newly discovered evidence of an audiotape in which he confessed, Doc. 1, at 12–13, that tape was played at trial, *see* Doc. 6-2, at 587–90. Neal also testified at trial about what Officer Mohn told him, *id*. at 325, 332; *see also id*. at 639. So the audiotape and Neal's conversation with Mohn are not evidence that Neal discovered after trial and would not serve as the *factual predicate* of a claim under 28 U.S.C. § 2244(d)(1)(D).

F.3d 595, 610 (6th Cir. 2009), the Sixth Circuit held that "when a state defendant files a motion for new trial before filing a direct appeal, and when the denial of that motion is then consolidated with and reviewed during the direct appeal, the motion for new trial is part of the original criminal proceedings and is not a collateral proceeding." Neither of the factors in *Pudelski* are present in Neal's case. Neal filed his motion for new trial after the Ohio court of appeals had already rejected his direct appeal. Doc. 6-1, at 119, 242. And no state court consolidated Neal's motion for new trial and his then-pending discretionary appeal in the Ohio Supreme Court. So Neal's motion for new trial was a collateral proceeding and did not affect the finality of Neal's conviction under section 2244(d)(1)(A). *See Lambert*, 81 F. App'x at 3.

Even if the Court were to consider Neal's motion for new trial as part of Neal's direct appeal, Neal's petition would still be time-barred. The Ohio court of appeals affirmed the trial court's rejection of Neal's motion for new trial on June 20, 2018. Doc. 6-1, at 324. Neal had 45 days to appeal, until August 5, 2018, *see* Ohio S.Ct.Prac.R. 7.01(A)(1)(a)(i), but he did not appeal. The limitations period would have started running the next day, August 6, 2018, and would have expired on August 6, 2019. So even if the Court were to apply a later start-date, which Neal is not entitled to, Neal's May 2021 petition would be about one-and-a-half years late.

Although Neal filed in the Ohio court of appeals under Ohio Appellate Rule 26(B) delayed applications to reopen his direct appeal, these filings did

23

not affect the limitations start-date. This is so because an application to reopen an appeal under Ohio Appellate Rule 26(B) is a state collateral proceeding, not direct review, which may toll, but not restart, the limitations period. *See Lopez*, 426 F.3d at 353; *see Morgan v. Eads*, 818 N.E.2d 1157 (Ohio 2004).

### 2. Tolling principles do not excuse the time bar

#### 2.1 Statutory tolling

The statute of limitations is tolled for any period in which a properly filed petition for post-conviction relief is pending before the state courts. 28 U.S.C. § 2244(d)(2); *see Wall v. Kholi*, 562 U.S. 545, 550–51 (2011). To toll the running of the statute of limitations, however, a post-conviction motion must be properly filed. A post-conviction application is not properly filed unless "'its delivery and acceptance [follow] the applicable laws and rules governing filings'—including any state-imposed time limits." *Davis v. Bradshaw*, 900 F.3d 315, 323 (6th Cir. 2018). Under this "understanding, a [post-conviction] petition filed after a time limit, and which does not fit within any exceptions to that limit, is no more 'properly filed' than a petition filed after a time limit that permits no exception." *Pace v. DiGuglielmo*, 544 U.S. 408, 413 (2005). Moreover, the statutory tolling provision does not "'revive' the limitations period (i.e., restart the clock at zero); it can only serve to pause a clock that has not yet fully run. Once the limitations period is expired, collateral petitions can

no longer serve to avoid a statute of limitations." *Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003) (citation omitted).

To recap, Neal's one-year limitations period ran from July 18, 2017 until July 18, 2018.

Neal filed a motion for new trial on January 11, 2017, Doc. 6-1, at 242, and ultimately the Ohio court of appeals rejected it on June 20, 2018, *id.* at 324. The Warden argues that this motion doesn't toll the limitations period because it was denied as untimely and, therefore it wasn't "properly filed." Doc. 6, at 23. But although the trial court denied Neal's motion for new trial as untimely and barred by res judicata, Doc. 6-1, at 247–48, the Ohio court of appeals affirmed the trial court's judgment only on the basis of res judicata, *id.* at 328. A motion denied by the state court on the basis of res judicata is a properly filed post-conviction motion within the meaning of § 2244(d)(2). *Henderson v. Bunting*, 698 F. App'x 244, 247 (6th Cir. 2017). The Warden does not acknowledge the Ohio court of appeals' res judicata ruling or explain how it effects the statutory tolling calculation.

Even if Neal's motion for new trial would have been properly filed such that it tolled the limitations period, Neal's petition is still time-barred. The limitations period would have started to run on June 21, 2018, the day after the Ohio court of appeals affirmed on the basis of res judicata the trial court's rejection of Neal's motion for new trial, and would have expired on June 21,

2019.[6] The only item that Neal filed during this time period was a December 2018 delayed application to reopen under Ohio Appellate Rule 26(B), Doc. 6-1, at 216, which the Ohio court of appeals denied as untimely, *id.* at 227–28. Because the court denied Neal's application to reopen as untimely, it was not *properly filed* under section 2244(d)(2) and doesn't toll the limitations period. *See Pace*, 544 U.S. at 414.

None of Neal's other state court filings toll the limitation period because Neal filed them after the limitations period had already expired.[7] *Vroman*, 346 F.3d at 602. And all but one of them—Neal's October 2020 state habeas petition—were expressly denied as untimely or not properly filed. *See* Doc. 6-1, at 342–43, 345, 349–50, 371, 234–35.

### 2.2   Equitable tolling

Petitioners may also be entitled to "equitable tolling" when they have been "pursuing [their] rights diligently" and "some extraordinary

---

[6]    Statutory tolling doesn't include the time to appeal a post-conviction filing if the petitioner doesn't appeal. *Scarber v. Palmer*, 808 F.3d 1093, 1095–97 (6th Cir. 2015). And even if Neal's motion for new trial would have been considered part of Neal's direct review, that would not change the outcome of the statute of limitations analysis. This is so because even adding the 45-day time period Neal would have had to appeal, *see* S.Ct.Prac.R. 7.01(A)(1)(a)(i), Neal's habeas petition would still be about a year-and-a-half late.

[7]    In his petition, Neal cites *Rhines v. Weber*, 544 U.S. 269, 272 (2005), in which the petitioner's state habeas petition tolled the statute of limitations for eleven months. Doc. 1, at 7. Neal submits that he filed his state habeas petition on October 8, 2020. *Id.* But in *Rhines*, the petitioner's one-year limitations period had only run for three days when the petitioner filed his state habeas petition. 544 U.S. at 272. Here, the one-year limitations period had already expired when Neal filed his state habeas petition.

circumstance" prevented them from timely filing their habeas petition. *Holland v. Florida*, 560 U.S. 631, 649 (2010) (citing *Pace*, 544 U.S. at 418). Petitioners bear the burden of "persuading the court" that they are entitled to equitable tolling. *Griffin v. Rogers*, 308 F.3d 647, 653 (6th Cir. 2002). Neal hasn't offered any explanation relevant to equitable tolling in his petition or his traverse. *See* Docs. 1, 7. To the extent that he could argue that he was unaware of the one-year limitations period, such an argument would fail because "ignorance of the law, even for an incarcerated pro se petitioner, 'is not sufficient to warrant equitable tolling.'" *Harvey v. Jones*, 179 F. App'x 294, 299 (6th Cir. 2006) (quoting *Allen v. Yukins*, 366 F.3d 396, 403 (6th Cir. 2004)).

Finally, a claim of "actual innocence" may overcome the one-year statute of limitations if the petitioner "demonstrates actual innocence so that by refusing to consider his petition due to timeliness the court would cause a fundamental miscarriage of justice." *Patterson v. Lafler*, 455 F. App'x 606, 609 (6th Cir. 2012) (citing *Murray v Carrier*, 477 U.S. 478, 495–96 (1986)). "A valid claim of actual innocence requires 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). "The evidence must demonstrate factual innocence, not mere legal insufficiency." *Id.* (citing *Bousley v. United States*, 523 U.S. 614, 623 (1998)). The Supreme Court underscored that "the miscarriage of justice exception ... applies to a severely confined category: cases

27

in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted the petitioner.'" *McQuiggin v. Perkins*, 569 U.S. 383, 394–95 (2013) (quoting *Schulp*, 513 U.S. at 329). The timing of an actual innocence claim can "seriously undermine the credibility" of the claim, if a petitioner presents it after a period of "[u]nexplained delay." *Id.* at 399–400.

Neal had not identified "new reliable evidence … not presented at trial," *see Schulp*, 513 U.S. at 324, showing that "it is more likely than not that no reasonable juror would have convicted" him, *see McQuiggin*. So Neal's petition remains time-barred.

### Conclusion

For the reasons set forth above, I recommend that Neal's Petition be dismissed as time-barred.

Dated: February 5, 2024

       */s/ James E. Grimes Jr.*
       James E. Grimes Jr.
       U.S. Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).